**UNITED STATES of America,**

v.

**Francisco PADILLA, Ramon Torres, a/k/a "Bienvenido Torres" a/k/a "Chichi," and Agripina Fernandez, Defendants.**

No. 97 CR. 72(SAS).

United States District Court, S.D. New York.

Aug. 15, 1997.

determination of plaintiffs' claims.

David Esseks, Asst. U.S. Atty., New York, NY, for Government.

James Roth, Hurwitz, Stampur & Roth, New York, NY, for Padilla.

Gary S. Villanueva, New York, NY, for Fernandez.

Jorge Guttlein, Aranda & Guttlein, New York, NY, for Torres.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendants Francisco Padilla ("Padilla"), Ramon Torres ("Torres"), and Agripina Fernandez ("Fernandez") are charged with conspiring to distribute heroin in violation of 21 U.S.C. § 846. Each defendant moves for an

order to suppress physical evidence seized at their respective apartments in the course of arrests conducted on the mornings of August 14, 1996 (Padilla) and October 18, 1996 (Torres and Fernandez), and to suppress post-arrest statements. Hearings on these motions were held on June 6, 1997 and July 11, 1997. The defendants also move for orders compelling the government (1) to disclose the names of confidential informants and trial witnesses, and (2) to produce all appropriate evidence under *Brady* and *Giglio*, and evidence of prior bad acts and uncharged criminal conduct regarding trial witnesses. Finally, defendants Padilla and Fernandez move for an order to suppress evidence obtained through electronic surveillance pursuant to Fed.R.Crim.P. 12(b)(3) and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510.

I made the following rulings in open court following the June 6, 1997 hearing: (1) all motions to suppress post-arrest statements on the grounds that (a) defendants were not advised of their *Miranda* rights, and (b) if they were advised of their rights, they did not voluntarily waive them, are denied; (2) Torres' motion to suppress the physical evidence seized from his apartment is denied; (3) all motions to compel disclosure of the identities of informants and witnesses are denied except as required by Fed.R.Crim.P. 16; (4) all motions for production of evidence are denied except as required by *Brady, Giglio,* and Fed.R.Crim.P. 35. *See* Transcript of Suppression Hearing, June 6, 1997, "Tr. I" at 195–202.

For the reasons stated below, Padilla's and Fernandez' motions to suppress evidence obtained by electronic surveillance are denied. Fernandez's motion to suppress physical evidence seized from her apartment is granted in part and denied in part. Padilla's motion to suppress physical evidence and post-arrest statements on the ground that his arrest was unlawful requires a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

## I. FINDINGS OF FACT

### A. Defendant Padilla

On August 14, 1996, Special Agent Diane Ingalls submitted a sealed complaint to Magistrate Judge Andrew J. Peck in support of her applications for, *inter alia,* a warrant for the arrest of defendant Padilla and a warrant to search Padilla's residence at Apartment 1B, 2788 Kingsbridge Terrace, Bronx, New York. *See* Declaration of James Roth, Padilla's attorney, dated June 18, 1997, ("Roth Decl.") Ex. B. The complaint alleged that Padilla was an active participant in a heroin distribution conspiracy, and included details from 19 intercepted telephone calls in support of that charge. *Id.* Of the 19 calls, 9 described the participation of a man identified in the complaint as Francisco Padilla, a/k/a "Padi," a/k/a "Pali," a/k/a "Palillo." *Id.* But in a Report of Investigation by Special Agent Ingalls dated August 19, 1996, the government acknowledged that Palillo and Padilla are not the same man, and that the 9 telephone calls described in the complaint all referred to Palillo rather than Padilla. *See* Roth Decl. Ex. C. The only accurate information in the complaint concerning Padilla is that he was surveilled driving Eligio Momoyo on May 15, 1996, in what the DEA believes was a delivery of 129 grams of heroin. *See* Roth Decl. Ex. B.

Magistrate Judge Peck issued the requested warrants on the morning of August 14, 1996. When federal agents and New York City police detectives arrived at 2788 Kingsbridge Terrace shortly thereafter to execute the warrants, they were informed by the building's landlord that Padilla was in fact domiciled in the basement apartment of 2788 Kingsbridge Terrace, rather than apartment 1B. *See* Tr. I at 8. Special Agent Harry Brady gave the following testimony:

Q. When you got to the door of apartment B, what happened?

A. Ms. Carney [the landlord] knocked on the door and asked for Mr. Padilla to come to the door. I wanted him to hear a familiar voice.

Q. What happened next?

A. Mr. Padilla came to the door.

Q. And what if anything did you say to him?

A. I asked him his name and his date of birth, he identified himself as Francisco X.

Padilla. I asked him to step out in the carport area, which he did, and I told Detective Carter and Detective Jim Nusafaro to arrest him. They placed handcuffs on him. I would say it was about 7:10 a.m., 7:05.

Q. In what language did you speak with Mr. Padilla?

A. When I asked him to come out, it was in English. I motioned for him to step outside from the doorway in English and with a waving motion, which he did.

Q. Do you speak Spanish?

A. No.

*Id.* at 9–10. Realizing that Padilla spoke only Spanish, the agents summoned a Spanish-speaking agent, Special Agent Ed Bourdon ("Bourdon"). *Id.* at 11. Bourdon arrived approximately 15 minutes later and advised Padilla of his *Miranda* rights in Spanish. *Id.* at 47. Bourdon then gave Padilla a Spanish consent to search form, with the name and location spaces left blank, and asked him to read it. *Id.* at 52–53. The Court Interpreter translated that letter as follows:

### Consent to Search

I, *Francisco Padilla DOB: 26 Jan 53* having been advised of my constitutional rights not to permit the search of the premises or establishment mentioned below without a search warrant and of my right to refuse consent to said search, hereby authorize *S/A Edwin Bourdon* and *S/A Matt Carbone*, Special Agents of the Drug Enforcement Administration of the United States Department of Justice, to carry out a complete search of my premises or establishment which is located at *2788 Kingsbridge Ter. Basement Apt, Bronx, N.Y. 10463.*

I give these agents authorization to remove from my premises or establishment any letters, papers, materials, or other property they wish.

This written consent is given by me to these agents of my own free will without my having been threatened or promised anything.

Signature /s/

### Date 8/14/96

*Id.* at 52, 181, Government Exs. 2, 2A. When Padilla finished reading, Bourdon asked in Spanish, "are you willing to sign it? Do you understand it? Is there anything you don't understand?" *Id.* at 53. Padilla said he had no problem and signed the form. *Id.* Bourdon and Special Agent Matt Carbone each then signed the bottom of the form and filled in Padilla's name, date of birth, and the location of his premises. *Id.* at 53–54. The agents and officers then searched Padilla's apartment and seized bills, telephone books, rent receipts, personal papers, business cards and other miscellaneous documents. *See* Roth Decl. ¶ 6.

### B. Defendant Fernandez

At approximately 7 a.m. on the morning of October 18, 1996, Group Supervisor Ava Cooper–Davis ("Cooper–Davis"), Special Agents Rod Patterson, Mike Barbuti, and Diane Ingalls ("Ingalls") arrived at 601 West 137th Street, Apartment 34, New York, New York, to execute an arrest warrant for defendant Agripina Fernandez. *Id.* at 120. The agents knocked and identified themselves as police officers. *Id.* Defendant Fernandez, wearing her night clothes, opened the door and identified herself as "Josefina." *Id.* at 121. The agents entered the apartment and, with guns drawn, performed a security sweep to find "Agripina Fernandez," and instead found the defendant's parents and two teenage daughters. *Id.* at 121, 137, 168. Ingalls, with Cooper–Davis translating, told the woman claiming to be "Josefina" that she knew she was really Agripina Fernandez, and the woman admitted that to be true. *Id.* at 122. Ingalls then told the defendant that she was under arrest for a narcotics-related offense, at which point the defendant, her parents, and her children all became visibly upset. *Id.* at 129. In Ingalls' words, the defendant "was very insistent that we look around the apartment, she said 'look anywhere, you will see there is no drugs, there is no guns, I have done no drug dealing,' and she was very insistent that we look around . . . . because we weren't going to find any drugs if we did." *Id.* at 122, 132. Ingalls asked Cooper–Davis to confirm with the defendant that she was giving consent to search, and Cooper–Davis

asked, "Ms. Fernandez, do you mind if we look in your bedroom? You have the right, we don't have to search if you don't want us to. Do you have full authority over this bedroom? Is this your bedroom?" *Id.* at 165. The defendant responded that it was her bedroom and that the agents could search it. *Id.* Ingalls searched the bureau and the defendant's purse and seized three pieces of mail addressed to Jose A. Garcia, six business cards, three pieces of paper with telephone numbers on them, a small notebook, a copy of a lease in the defendant's name for an apartment at 2788 Kingsbridge Terrace, an address book, a telephone bill, and a food coupon. *See* Transcript of Suppression Hearing, July 11, 1997, "Tr. II" at 212; Government Ex. 4. Ingalls and Cooper–Davis then drove the defendant to DEA headquarters. During the drive, her *Miranda* rights were read to her from a DEA 13 A card. *See* Tr. I at 166. On August 8, 1997, I examined the items taken from Fernandez' apartment *in camera.*

## II. SUPPRESSION OF WIRETAP EVIDENCE

■ Defendant Padilla moves to suppress evidence obtained by electronic surveillance of the telephones assigned numbers (718) 601–2922 and (718) 220–4211. Defendant Fernandez also moves to suppress evidence from (718) 601–2922. These phones were used primarily by Jose A. Garcia and Eligio Momoyo, both of whom are alleged to be members of the heroin distribution conspiracy. The order authorizing the tap of Garcia's telephone was signed by Judge David N. Edelstein pursuant to the May 30, 1996 application of Special Agent Joseph Lipp. The order authorizing the initial tap of Momoyo's telephone was signed by Judge Edelstein pursuant to the July 8, 1996 application of Special Agent Ingalls, and was renewed by Judge Edelstein pursuant to the August 7, 1996 application of Special Agent Ingalls.

Defendants argue that the aforementioned applications fail to state why alternative investigative techniques were unsuccessful or unlikely to succeed or too dangerous as required by 18 U.S.C. § 2518(1)(c). *See United States v. Miller,* 116 F.3d 641, 663 (2d

Cir.1997). I find that the May 30, 1996 affidavit of Special Agent Lipp meets these requirements. Special Agent Lipp explained that during the investigation the agents used surveillance, an undercover operative, and pager taps. He further explained why these techniques were insufficient to successfully investigate the suppliers of the conspiracy. Similarly, the July 8, 1996 and August 7, 1996 affidavits of Special Agent Ingalls met the requirements of the statute. She attested to the use of surveillance, toll records, pen registers, and two undercover operatives in this investigation. Special Agent Ingalls went on to state that these techniques were insufficient to investigate the higher levels of the organization. Both affidavits successfully explained why electronic surveillance was required. Defendants' motions to suppress the fruits of those wiretaps are therefore denied.

## III. SUPPRESSION OF PHYSICAL EVIDENCE

The test for assessing the validity of consent to search was established in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973):

> the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.

*Id.* at 227, 93 S.Ct. at 2047–48. Moreover, "only unreasonable searches are proscribed by the Fourth Amendment, and the issue of reasonableness is to be measured by an objective standard." *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995): "The ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search'" (citing *United States v. Sanchez,* 32 F.3d 1330, 1334–35 (8th Cir.1994)).

A. Defendant Padilla

1. Voluntary Consent

■ Padilla argues that the items seized from his apartment should be suppressed because he did not willingly consent to the search. However, based on the evidence presented at the hearing, I find that Special Agents Bourdon and Carbone had a reasonable basis to believe that Padilla had willingly consented. Padilla was given a "Consent to Search" form to read and was asked if he understood what it said. He answered that he did understand and he signed the form. Eight months later, in his April 23, 1997 affidavit, Padilla claimed that he did not understand that he could refuse consent. *See* Affidavit of Francisco Padilla, dated April 23, 1997, ¶ 3. Even if true, this lack of understanding is not dispositive under the *Schneckloth* standard which does not require a defendant to be aware of his right to refuse consent.

In analyzing the "totality of the circumstances," it was objectively reasonable for the officers to conclude that Padilla had voluntarily consented to the search. The officers did not engage in any violent or threatening conduct. They brought in an interpreter and explained to Padilla his right to decline consent. They gave Padilla the opportunity to ask questions or request a fuller explanation. In response, Padilla told the agents he understood his rights and executed a written consent. Under those circumstances, it was objectively reasonable for the agents to conclude that Padilla's consent to the search was voluntary.

2. Probable Cause

Padilla also argues that the government failed to present adequate evidence of probable cause in its arrest warrant application. The government concedes that all of the telephone intercepts discussed in the complaint mistakenly referred to Padilla instead of another subject named Palillo. The only evidence in the complaint which correctly identifies Padilla is the visual surveillance on May 15, 1996 of Padilla driving a man known to the agents as Momoyo in what the agents believe was a delivery of 129 grams of heroin. Padilla contends that he was an unwitting chauffeur during the drive in question and that his mere association with Momoyo does not amount to probable cause for his arrest.[1]

Under *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978), a hearing is required to determine the validity of a warrant if the defendant makes a "substantial preliminary showing" that (1) false statements are contained in the complaint, (2) there is no probable cause independent of those false statements, and (3) the false statements were made intentionally or with reckless disregard for the truth. The government concedes the first element, that false statements are contained in the complaint. There is also a substantial likelihood that the Magistrate Judge would not have found probable cause to arrest Padilla based solely on the surveillance of him driving Momoyo on one occasion. However, it is not clear whether the government was reckless or merely negligent in assuming Palillo was Padilla.

The government relies on two cases for the proposition that Padilla must make a substantial preliminary showing of recklessness before he is entitled to a *Franks* hearing. In *United States v. Millar*, 79 F.3d 338, 342–43 (2d Cir.1996), the Second Circuit affirmed the denial of a *Franks* hearing when the allegedly false or misleading information in a warrant affidavit, even if proven to be false, would not negate probable cause. *See also United States v. Fermin*, 32 F.3d 674, 676–77 (2d Cir.1994).[2] In *United States v. Dale*, 991 F.2d 819, 844 (D.C.Cir.1993), a *Franks* hear-

---

1. Padilla's probable cause argument is of particular moment because if the arrest warrant was invalid, then under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the agents could not arrest Padilla at his home in the absence of exigent circumstances, even assuming they had probable cause to arrest him. There is no need at this time to determine whether this arrest is unlawful under *Payton*. Suffice it to say that if the arrest was improper, then the evidence and statements seized pursuant to that arrest must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

2. The District Court in *Fermin* held a *Franks* hearing even though it determined that there was no preliminary showing of recklessness.

ing was denied because, among other reasons, "the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth."

■ These cases are distinguishable from this case for several reasons. First, the alleged recklessness in *Dale* consisted of failing to investigate more thoroughly, not of basing an entire warrant application on false information. *Id.* Second, the alleged falsities in both *Millar* and *Dale* did not negate probable cause when removed from the affidavit. *See Millar,* 79 F.3d at 342; *Dale,* 991 F.2d at 844–45. Finally, in *Dale* the government disputed whether the affidavit contained false information. *Id.* at 845.[3] In contrast, the government here concedes that the bulk of the information contained in the complaint was false. There is a strong likelihood that this complaint failed to establish probable cause in the absence of the false material. Under these circumstances, Padilla has made a substantial showing that the complaint was prepared recklessly. A *Franks* hearing is therefore required.

### B. Defendant Fernandez

Fernandez argues that although she did voluntarily consent to a search, that consent was limited in scope to a search for drugs and guns. She contends that any documents seized were taken without her consent and must be suppressed.

■ I find that Fernandez' spontaneous offer, as reported by Special Agent Ingalls, to "look anywhere, you will see there is no drugs, there is no guns," was a limited consent to search for drugs and guns as permitted by *Florida v. Jimeno,* 500 U.S. 248, 252, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents").[4] While Cooper–Davis confirmed in Spanish that Fernandez was consenting to a search, she did not discuss the scope of the consent. Under those circumstances, it was not objectively reasonable for the agents to conclude that Fernandez gave them a blanket consent to search.

The next question, then, is what items an officer may seize when conducting a limited search. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993–94, 19 L.Ed.2d 1067 (1968). The warrantless seizure of an item is justified under the plain view exception where (1) the police have lawful access to the place from which the item can be plainly viewed; (2) the item seized is in fact in plain view at the time it is discovered; and (3) it is "immediately apparent" to the police at the time of discovery that the item constitutes evidence of, an instrumentality of or fruit of a crime. *See Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990); *United States v. Yu,* 755 F.Supp. 578, 581 (S.D.N.Y.1991). The "immediately apparent" requirement is met only where the officers have "probable cause to believe that an object in plain view is [evidence of a crime] without conducting some further search of the object." *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334 (1993). *See also Soldal v. Cook County,* 506 U.S. 56, 66, 113 S.Ct. 538, 545–46, 121 L.Ed.2d 450 (1992) ("in the absence of consent or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the proba-

---

3. The other cases which the government cites for the proposition that the complaint was not reckless all involve determinations made after a *Franks* hearing, and are of no benefit in determining what level of showing is required to receive a *Franks* hearing.

4. This finding is supported by the theory that "no sane man would consent to a search that was sure to turn up evidence he wanted concealed... whatever the appearance of consent from a person's conduct, he did not 'in fact' consent unless he did not know that the evidence was there to

be found." Lloyd L. Weinreb, *Generalities of the Fourth Amendment,* 42 U. Chi. L.Rev. 47, 55 (1974) (citing *Higgins v. United States,* 209 F.2d 819, 820 (D.C.Cir.1954)). Here, all three defendants knew they had no contraband in their apartments and were willing to prove as much to the agents. It is highly unlikely that they felt the same way about documents linking them to the alleged drug conspiracy. Only Fernandez, however, specifically limited the scope of her consent.

ble cause standard and if they are unaccompanied by unlawful trespass") (citations omitted); *Arizona v. Hicks,* 480 U.S. 321, 326–27, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987) (requiring probable cause to seize items found in plain view); *Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967) (requiring a nexus between any objects seized in such circumstances and the criminal behavior being investigated); *United States v. Grubczak,* 793 F.2d 458, 461 (2d Cir.1986) ("the incriminating nature of an object is generally deemed 'immediately apparent' where police have probable cause to believe it is evidence of crime") (quoting *United States v. Ochs,* 595 F.2d 1247, 1258 (2d Cir.1979)).

■ The facts of this case clearly satisfy the first two prongs of the *Horton* test. Fernandez consented to a search for guns and drugs, thus allowing the agents lawful access to her dresser and purse, where the seized documents were found in plain view. *See* Tr. I at 123. The question of whether it was "immediately apparent" to Agent Ingalls that the documents she seized were evidence of a crime *without further search* of those documents, *see Dickerson,* 508 U.S. at 375, 113 S.Ct. at 2136–37, is not so easily answered. Just as officers may not, upon glancing at a stereo, move it to look for a serial number unless they have probable cause to believe it was stolen, *see Hicks,* 480 U.S. at 324–29, 107 S.Ct. at 1152–55, neither may officers, upon glancing at documents noticeably beyond the scope of the consent, peruse them in search of incriminating evidence. *See United States v. Silva,* 714 F.Supp. 693, 696 n. 6 (S.D.N.Y.1989) ("if the incriminating nature of the document cannot be readily ascertained without moving or disturbing it, an officer may not, absent probable cause move or further search the book or document"). *See also United States v. Rude,* 88 F.3d 1538, 1552 (9th Cir.1996) (suggesting this limitation in a search conducted pursuant to a valid search warrant).

■ Documents inherently require greater examination to determine their relevance than do other physical items. In *Andresen v. Maryland,* the Supreme Court admonished:

> We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.

427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976). In cases where officers are authorized to search only for certain incriminating documents, the inspection of all documents—incriminating and innocent—is inherent in the process of deciding which documents are incriminating and which are not. *See United States v. Soussi,* 29 F.3d 565, 571–72 (10th Cir.1994); *United States v. Menon,* 24 F.3d 550, 559–60 (3d Cir.1994).

■ But in this case, the agents were only authorized to search for guns and drugs. *All* documents were beyond the scope of the lawful consent. Special Agent Ingalls did not have license to cursorily peruse the documents to determine if they were incriminatory because all documents were beyond the scope of her lawful search. Special Agent Ingalls had probable cause to seize evidence plainly relating to Jose A. Garcia and to 2788 Kingsbridge Terrace. But Ingalls did not have probable cause to seize documents whose evidentiary value was not immediately apparent. *See Silva,* 714 F.Supp. at 696.

All documents which were not immediately incriminatory on their face should not have been seized. Accordingly, the telephone bill for the defendant's West 137th Street apartment, the defendant's address book[5], the defendant's small spiral-bound notebook, the

---

**5.** The defendant's address book consists of two cards, metallic on the outside and magnetic on the inside, which attract each other and seal between them a folded piece of lined paper.

When closed, there is no obvious indication that it contains addresses, and it is too small to contain drugs or guns.

eight business cards, and the slip of paper with Spanish writing and numbers on it are suppressed.[6] The copy of a lease for an apartment at 2788 Kingsbridge Terrace and all mail addressed to Jose A. Garcia were properly seized because Garcia's name and the Kingsbridge Terrace address are in plain view on the face of those documents, and it was therefore immediately apparent to the agent that those items constituted evidence of the conspiracy.

## IV. CONCLUSION

Defendants' motions to suppress evidence obtained by electronic surveillance are denied. Fernandez's motion to suppress physical evidence seized from her apartment is granted in part and denied in part.

SO ORDERED.

---

**6.** The government has already agreed not to use the West 137th Street telephone bill, the business cards, and the slip of paper at trial. *See* Letter from AUSA David Esseks to the Court, dated July 18, 1997, at 4.